IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ERIN WILCOX AND CONNIE SLINGBAUM, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARKETPRO SOUTH, INC. d/b/a MARKETPRO HOMEBUYERS,<br><br>Defendant. | Case No.: 1:23-cv-02364-SAG |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION OF DEFENDANT, MARKETPRO SOUTH, INC., d/b/a MARKETPRO
HOMEBUYERS, TO EXCLUDE THE EXPERT REPORT
AND ANTICIPATED TESTIMONY OF JEFFREY ROTHBART**

Pursuant to Federal Rules of Evidence 401, 702, and 704, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), Defendant, MarketPro South, Inc. d/b/a MarketPro Homebuyers ("MarketPro"), submits this Memorandum of Law in support of its motion to exclude the expert report and anticipated testimony of Plaintiffs' proposed expert, Jeffery S. Rothbart.

**I.   INTRODUCTION**

Plaintiffs, Erin Wilcox and Connie Slingbaum, on behalf of themselves and a proposed class, allege that MarketPro violated the Telephone Consumer Protection Act, 47 U.S.C. § 227(a)(4) ("TCPA" or the "Act"), by sending them text messages inquiring about their willingness to sell their homes despite their alleged inclusion on the national Do Not Call registry. (Compl. at ¶¶ 83, 94.) But Section 227(a)(4) of the TCPA applies only to "telephone solicitations." As this Court recognized in December, a "telephone solicitation" is statutorily defined as "'the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of,

or investment in, property, goods, or services' being offered." (ECF Dkt. No. 18, Opinion at 4) (quoting TCPA). This presents an insurmountable obstacle to Plaintiffs' claims because MarketPro's communications were "devoid of any encouragement for Plaintiffs to purchase anything and contain only an express offer for MarketPro to purchase (or to communicate an offer to purchase) Plaintiffs' homes." (*Id.* at 4-5.)

The Court's prior ruling on MarketPro's motion to dismiss provides Plaintiffs with only a narrow path to saving their claims: proof that the "actual purpose" of MarketPro's text messages "was to encourage a surreptitious sale of its various real estate-related services, couched as a straightforward home-buying offer." (Opinion at 5-6.) Plaintiffs appear to believe that Mr. Rothbart, a full-time "real estate expert" and part-time law professor, can help. He cannot.[1] Instead, Plaintiffs' reliance on Mr. Rothbart's opinions is predicated on slipshod transitive logic: because real estate agents and brokers typically handle the complexities of real estate transactions, Plaintiffs appear to believe that ***anyone*** who handles such transactions is constructively a real estate agent or broker. And, because a real estate agent or broker provides "services" to their customers, Plaintiffs contend that anyone who does what a real estate agent or broker does is, by extension, providing a service. As a matter of fact, this thesis is baseless—the record supports MarketPro's repeated assertions that it does not provide (or sell) services to prospective home-sellers. (*See, e.g.*, Rule 30(b)(6) Deposition of Robin Bogin at 134:4-18, part of Ex. B hereto (stating that MarketPro "doesn't provide services"); *id.* 208:12-209:2 (stating that MarketPro does not provide escrow services); *id.* at 210:12-211:2 (stating that MarketPro does not provide packing and moving services).

---

[1] *See* Rothbart Report (the "Report"), a copy of which is attached as Exhibit A.

Further, as reflected in Mr. Rothbart's opinions, this framework suffers from a litany of other legal and evidentiary defects. First, he impermissibly traffics in legal analysis and conclusions that invade the exclusive province of the Court. Second, Mr. Rothbart's Report fails to meet the threshold precondition of relevance under Federal Rules of Evidence 401 and 702. Because (i) real estate agents and brokers provide services to both sellers and buyers, and (ii) the tasks and costs related to real estate transactions are not the *exclusive* domain of *seller*-side representatives, the fact that MarketPro might arrange certain aspects of a closing is not probative of whether its texts were attempts to *sell services to Plaintiffs*. Rather, these efforts merely reflect steps MarketPro was willing to undertake to obtain a property—as MarketPro has contended all along. Third, Mr. Rothbart's avoidance of contrary facts and distortion of familiar legal principles renders his opinion that MarketPro was a constructive or *de facto* real estate agent patently unreliable. Whether taken individually or collectively, these infirmities warrant exclusion.

## II.    LEGAL STANDARD

The Federal Rules of Evidence impose two threshold requirements on expert testimony: relevance and reliability. Before Mr. Rothbart can testify, this "court must satisfy itself that the proffered testimony is relevant to the issue at hand, for that is 'a *precondition* to admissibility.'" *Sardis v. Overhead Door Corp.,* 10 F.4th 268, 282 (4th Cir. 2021) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 (1993)). That precondition is imposed by Federal Rule of Evidence 401, the Rules' catch-all relevance provision, and Federal Rule of Evidence 702, which requires that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert,* 509 U.S. at 591.

Relevant evidence under Rule 401 must "make a fact more or less probable than it would be without the evidence" and be material to "determining the action." Fed. R. Evid. 401. Rule 702

implicates relevance because "'[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Sardis*, 10 F.4th at 282. Expert testimony must also be reliable, of course—meaning it must be "based on sufficient facts or data," "come[ ] from reliable principles and methods," and "reliably appl[y] those principles and methods to the facts of the case." *Kadel v. Folwell,* 100 F.4th 122, 158 (4th Cir. 2024).

Even where specialized knowledge *could*, in theory, be relevant and reliable, whether it will assist a trier of fact depends on *how* the opinion is proffered. Most notably, "'testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible[,]'" *United States v. Mosby,* 626 F.Supp.3d 847, 857 (D. Md., 2022), because it "usurp[s] the court's role rather than aiding the jury." *U.S. v. Barile,* 286 F.3d 749, 760 (4th Cir. 2002). Courts considering challenges to expert testimony must therefore seek to "distinguish opinion testimony that embraces an ultimate issue of fact from opinion testimony that states a legal conclusion." *Barile,* 286 F.3d at 760. To determine the line between permissible opinion and inadmissible legal conclusions, courts focus on "'whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.'" *Id.* Where an expert's opinion "tracks the language" of the relevant "legal principle at issue or of the applicable statute" and/or the "terms employed have specialized legal meaning," the opinion is inadmissible. *Id.*

### III. LEGAL ANALYSIS

#### A. Rothbart's Legal Conclusions Impermissibly Invade the Province of the Court.

Initially, Mr. Rothbart's Report and anticipated testimony are inadmissible under Rule 702 because they do not seek to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Instead, Mr. Rothbart's opinions focus solely on whether MarketPro's

4

text messages were "telephone solicitations" under the TCPA, but that is an issue of law to be decided by the Court, not the jury. And even if Mr. Rothbart's Report and opinions are not broadly inadmissible as unhelpful, they are rife with impermissible legal analysis and conclusions—hardly a surprise given his job as a part-time law professor at Chicago Kent College of Law. More specifically, Opinion No. 1 in his Report purports to instruct this Court on what "[t]he Maryland Real Estate Broker Statute requires," (Report at 7), and how the statute "defines" real estate brokerage services. (*Id.* at 7-8.) Similarly, Opinion No. 2 instructs this Court on how "the Pennsylvania Real Estate Broker Statute imposes similar restrictions" on real estate brokers and agents. (*Id.* at 8.) Opinion No. 6 again seeks to instruct this Court on the "requirements" of Maryland and Pennsylvania's respective real estate licensing statutes. (*Id.* at 11.)

In each of these instances, Mr. Rothbart merely parrots and provides legal interpretations of the relevant statutes—or, to quote *Barile*, "tracks the language . . . of the applicable statute" and seeks to construe those statutes' "specialized legal meaning." *Barile*, 286 F.3d at 760. Similarly, Rothbart Opinion No. 7 seeks to provide a legal interpretation of MarketPro's "Form Contract I." (Rothbart Rep. at 12.) That, too, is off-limits. *See James McHugh Const. Co. v. Travelers Prop. Cas. Co. of Am.*, 223 F.Supp.3d 462, 472 (D. Md. 2016) ("expert testimony typically cannot be offered to support the interpretation of a contract term") (citing *Forrest Creek Associates, Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1242 (4th Cir. 1987) and *Truck Ins. Exch. v. Marks Rentals, Inc.*, 288 Md. 428, 433 (1980)); *Federal Ins. Co. v. New Coal Co., Inc.,* 415 F. Supp. 2d 647, 656 (W.D. Va. 2006) (granting "motion to exclude the expert…because the issue in this case is one of contract interpretation and thus expert testimony is not appropriate") (citing *Forrest Creek Assocs., Ltd.*).

Mr. Rothbart's attempt to apply those legal standards to MarketPro—specifically, his conclusion that MarketPro is constructively acting as a real estate broker or agent, is a *de facto* broker or agent, or is providing broker or agent services—is likewise inadmissible. (Report at 10-12.) This includes Opinion Nos. 5 through 7, where Rothbart impermissibly opines that MarketPro is "engaged in [agent or broker] behavior" and/or performs "brokerage related services." (*Id.*) Such testimony, like his impermissible testimony regarding legal standards, should be excluded because it is based on his (inaccurate) interpretation of various statutes. *See Mosby*, 626 F. Supp. 3d at 862 (excluding "expert testimony about the legal standards relevant to the CARES Act and Section 457(b) of the Internal Revenue Code, and how those legal standards should apply to the facts of this case.").

In short, Mr. Rothbart offers nothing more than his own legal interpretation of a variety of statutes and regulations and, in doing so, seeks to substitute his own version of the law for that of the Court. This is patently impermissible—construing statutes, identifying legal standards, and applying statutes and standards to the factual record is the *Court's* province, not Mr. Rothbart's. By usurping the role of the Court, Mr. Rothbart's Report contravenes the directive from *Barile*. The Court should exclude his report and testimony on that basis alone.

B. **Rothbart's Opinions Are Neither Relevant nor Reliable.**

In addition to his impermissible legal interpretations and conclusions, Mr. Rothbart's opinions fail to satisfy the relevance and reliability requirements of Rules 401 and 702.[2]

---

[2] As discussed below, Mr. Rothbart's rhetoric suggests his primary purpose is to impugn MarketPro's business model. (*See, e.g.,* Report at 12.) As a result, even if the Court concludes his opinions possess some marginal relevance, their probative value is far outweighed by their potentially prejudicial impact. As such, they should also be excluded under Federal Rule of Evidence 403.

6

1. **Mr. Rothbart's opinions are not probative of whether MarketPro sought to sell real estate services to Plaintiffs.**

From a relevance standpoint, Mr. Rothbart's characterization of MarketPro's actions as those of a real estate broker or agent does not make it more or less likely that MarketPro sought to sell "real estate services" to *Plaintiffs* for a simple reason – real estate agents and brokers can represent either sellers or buyers, and the various tasks and costs involved in real estate purchases are not exclusive to either side of the transaction. Aware of this, perhaps, Mr. Rothbart tiptoes around it, asserting that these "services" are "*typically reserved* for licensed real estate brokers." (Report at 10) (emphasis added).

The evidentiary record could not be clearer: MarketPro is not a real estate agent or broker. Rather, it is a real estate purchaser, who then assigns real estate contracts to investors in return for consideration. But even beyond that, none of the "services" Mr. Rothbart cites (e.g., estimating market value, inspecting property, or providing an explanation for a purchase offer) are exclusively reserved to seller-side real estate agents. (Report at 10.) Websites like Redfin and Zillow provide market value estimates, for instance, and no one would assert that they become a seller's agent by doing so. (*See, e.g.,* Bogin Dep. at 105:9-17, attached as Exhibit B.) Moreover, no reasonable property buyer would purchase a property without investigating the property's market value or conducting an inspection. Closing-related responsibilities, like "arranging for third party service providers (e.g., title, survey, escrow, etc.)," are no more exclusive—they are open to both regional variation and negotiation between the parties. (Report at 10.) *See also* Maryland Insurance Administration, "A Consumer Guide to Title Insurance," at 5 ("If you're buying a home, who pays for title insurance depends on local custom" but "[i]t may be something . . . that you can negotiate

with the seller of the property.").[3] In fact, many of the so-called "services" Mr. Rothbart discusses, like survey and title fees, are generally the responsibility of the buyer, not the seller. (*Id.*; Report at 11) (suggesting that arranging title insurance is a "benefit[] provided to the buyer").[4]

Thus, even if one accepts Mr. Rothbart's analysis at face value—i.e., that MarketPro's actions are analogous to those of a real estate agent or broker—his failure to establish that the actions and responsibilities he discusses are *exclusively* performed by seller-side agents renders his opinions irrelevant. Absent evidence that MarketPro assumed specific, exclusive *seller-representative* responsibilities, Mr. Rothbart's opinions establish only that MarketPro engages in real estate transactions. Put differently, because both buyer-side and seller-side agents perform the tasks at issue, *who* MarketPro "serves" by performing them is nothing more than a coin flip.[5] And a coin flip, by its very nature, cannot make anything "more or less probable." Fed. R. Evid. 401.

---

[3] This document is available on the Maryland Insurance Administration website at: https://insurance.maryland.gov/Consumer/Documents/publications/titleinsurancebrochure.pdf

[4] Notably, although MarketPro prefers to work with a specific title company given the volume of its business, it did not actually take on the closing responsibilities Mr. Rothbart discusses, like the "handling of title fees." Rather, MarketPro's 30(b)(6) witness, Robin Bogin, explained that the title company is paid from the actual buyer at the closing, to whom the real estate contract was assigned. (*See* Bogin Dep. at 170:3-12, part of Ex. B) ("You would have to ask [the title company] how they're compensated. They get— they get their money from the buyer.").

[5] Opinions from the Federal Communications Commission confirm that only certain, specific communications from real estate agents constitute "telephone solicitations." Most notably, the Commission explained in a 2005 opinion that, like "any entity," whether the TCPA applied to a real estate agent's call or text message was dependent on the nature of the communication. Where a call or text "discusse[s] a potential *sale* of the [recipient's] property to [a] represented buyer," the Commission explained, it did not fall within the ambit of the Act because such calls "are not encouraging the called party to purchase, rent or invest in property, as contemplated by the definition of 'telephone solicitation.'" F.C.C., *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Dock. No. 02-0278 (Feb. 18, 2005) at 6-7. Here, MarketPro was "representing" itself as a prospective buyer. Thus, even if Mr. Rothbart's attempt to characterize MarketPro's actions as those of a real estate agent and broker was accurate—it is not—his failure to identify any specific *seller-side* services renders his analysis non-probative.

To be clear, Mr. Rothbart's conclusion should not be taken at face value because his underlying logic is fundamentally flawed. No one is *required* to use an agent or broker to facilitate a property transaction—many sellers and buyers perform these same tasks themselves. For example, a buyer who attempts to make an offer more attractive by offering to take on additional transactional responsibilities or costs is not "selling a service" to a seller—it is simply doing what is necessary to consummate *its own* purchase. That a home seller often handles those responsibilities does not mean a buyer who takes them on instead, in an effort to sweeten an offer, is acting on the seller's behalf. The two parties remain (like any buyer and seller) on opposite sides of the transactional "table."

Finally, to support Plaintiffs' allegation that MarketPro sought to "sell" them services, Mr. Rothbart would need to show that MarketPro derives income from the services it allegedly sells. But Mr. Rothbart cannot identify any such income. Rather, the only "revenue" he identifies in his Report are sums paid to MarketPro by third-party investors – not property sellers. (Report at 12) ("MarketPro is a for profit [sic] enterprise which earns revenue by purchasing homes at below fair market value and then either selling the home or assigning the contract to acquire the home for fair market value."). As this Court and others have observed, the fact that MarketPro's messages result in downstream payments from third parties cannot be a basis for liability under Section 227(a)(4). (Opinion at 6.) *See also Hulce v. Zipongo*, No. 23-C-0159, 2024 WL 1251108, at *4 (E.D. Wisc. Mar. 18, 2024) (finding TCPA does not apply to a "communication" that "encourages some act that, through a preexisting chain of causation, will cause a third party to pay money for goods or services.").

For all these reasons, Mr. Rothbart's opinions are not the least bit probative of whether MarketPro was seeking to sell services to property sellers through its text messages. The Report

adds nothing to the actual inquiry before the Court, and the Court should preclude the Report and Mr. Rothbart's testimony.

### 2. Mr. Rothbart's opinions do not reliably apply legal principles to the facts of this case.

In addition to being impermissible and irrelevant, Mr. Rothbart's opinions are not based on "reliable principles and methods," nor do they "reliably appl[y] those principles and methods to the facts of the case." *Kadel,* 100 F.4th at 158. Although Mr, Rothbart purports to explain the legal intricacies of the real estate business, his analysis repeatedly disregards, elides, and/or distorts long-settled legal doctrines and definitions.

For instance, in asserting that MarketPro is constructively a real estate agent or broker, Mr. Rothbart ignores the defining aspect of agency: work performed **on behalf of another**. *See, e.g.,* BROKER, Black's Law Dictionary (11th ed. 2019) ("one who is engaged for another, usu. on a commission, to negotiate contracts relating to property in which he or she has no custodial or proprietary interest"); AGENT, Black's Law Dictionary (11th ed. 2019) ("Someone who is authorized to act for or in place of another; a representative"). This typically involves a fiduciary duty owed by the agent to the principal. *See, e.g., Wilkens Square, LLLP v. W.C. Pinkard & Co., Inc.,* 984 A.2d 329, 336 (Md. App. 2009) ("A real estate broker stands in a fiduciary relationship to his client."); *Dyer v. Criegler,* 788 A.2d 227, 233 (Md. App. 2002) (explaining that a "real estate agent's or broker's liability is founded on the law of agency" and "[b]rokers and agents ordinarily owe a fiduciary duty to their principals."). According to Mr. Rothbart, however, MarketPro does **not** act on behalf of any other party; it is driven by its own financial self-interest. (Report at 12) (opining that "MarketPro segments the real estate transaction to further *their* [sic] financial interests") (emphasis added). Notably, the fact that MarketPro is acting in its own interest is not news to the sellers it contracts with—that is made clear in MarketPro's form purchase contract,

10

which states that MarketPro is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (Bogin Dep. at 124:23-25, part of Ex. B.)

Although MarketPro's Rule 30(b)(6) representative Robin Bogin does not (unlike Mr. Rothbart) hold herself out to be an expert on "real estate agents," her own experience selling a house allowed her to identify numerous services provided *by agents for home sellers*. More specifically, Ms. Bogin's agent:

> looked through the property, she told us what we needed to do to get it ready for market. She sent her people in. We paid for it obviously. But she sent her people in. Had it painted. Had it recarpeted. Had it photographed. Had it staged. Wrote a listing agreement. Put it on the Multiple Listing Service. Held an open house. Had people, you know, at the open house while end users walked through and then presented us with offers to purchase the property negotiated any items that were requested to be fixed. She negotiated with the buyer's agent and helped us get those things rectified, and that's it.

(Bogin Dep. at 38:10-25, part of Ex. B). Mr. Rothbart does not identify any similar actions taken by MarketPro on behalf of home sellers. That is hardly surprising. MarketPro was attempting to purchase properties for a favorable price, not "stage" and market the property to drive up the listing value.

Finally, unable to fit the facts of the case to his legal conclusions, Mr. Rothbart is forced to distort basic contractual terminology. To support his opinion that that "MarketPro is earning valuable consideration from its practices of providing real estate brokerage related [sic] services," Mr. Rothbart asserts that MarketPro "earns this fee by purchasing the subject property for a below-market valuation and then selling (or assigning the contract to) that same subject property for fair market value." (*Id.*) This definition bears no relationship to the *legal meaning* of the word "consideration," which is a promise or performance received in exchange for a promise or performance. *See Ford v. Genesis Financial Solutions, Inc.,* 2024 WL 1340356, at *5 (D. Md. 2024) ("Consideration exists if 'a performance or a return promise [is] bargained for,' and '[a]

11

performance is bargained for if it is sought by the promisor in exchange for his ... promise and is given by the promisee in exchange for that promise.'") (quoting *Pettiford v. Next Generation Tr. Serv.*, 226 A.3d 15, 27 (Md. 2020)). As a matter of law, the money MarketPro receives from third-party investors cannot be "consideration" for services MarketPro provides to sellers. It is, instead, *income* derived from the difference between two discrete transactions: a negotiated purchase contract with a seller and the assignment of the right to that contract to a third-party investor.

Indeed, Mr. Rothbart (again) concedes as much in his discussion of the "Old City Living matter." (Report at 12.) There, he states that MarketPro "executed a contract to purchase a property from a homeowners for $20,000 on April 13, 2022," then "two weeks later, on April 27, 2022 . . . entered into an assignment contract with a third-party buyer for $110,000[.]" (*Id.* at 12.) He describes this as an "arbitrage" of the two sales prices (*id.*)—i.e., "[t]he process of buying something, such as raw materials or a currency, in one place and selling it immediately elsewhere in order to profit from the difference in prices[.]" ARBITRAGE, Black's Law Dictionary (11th ed. 2019). By his own admission, then, this is not "consideration" for any "real estate-related services" provided to sellers but instead MarketPro's "revenue," money "earn[ed]…by purchasing homes at below fair market value and then either selling the home or assigning the contract to the home for fair market value." (Opinion at 6.)[6]

In sum, even if Mr. Rothbart's legal analysis were relevant and appropriate—it is not—his failure to accurately summarize or reliably apply the legal principles he invokes to the facts of this case render his opinions wholly unreliable. Unable to identify any actual services that MarketPro provides to home sellers, Mr. Rothbart allows his conclusions to drive his analysis, ignoring

---

[6] As discussed above, this observation is not simply self-contradictory—it confirms the irrelevance of Mr. Rothbart's opinions.

essential aspects of "agency" and abandoning long-settled legal terminology in order to fit the facts to his theory of the case. Such testimony is patently unreliable and should be excluded.

## IV. CONCLUSION

For all the foregoing reasons, MarketPro respectfully requests the Court grant this motion and exclude the Report and testimony of Plaintiffs' putative expert, Jeffrey S. Rothbart.

Respectfully submitted:

*/s/ Walter Buzzetta*
Walter J. Buzzetta (No. 20825)
Stradley Ronon Stevens & Young, LLP
2000 K Street, N.W., Suite 700
Washington, DC 20006
(202) 507-6407
wbuzzetta@stradley.com

and

Eric M. Hurwitz (No. 18829)
Stradley Ronon Stevens & Young, LLP
457 Haddonfield Road, Suite 100
Cherry Hill, NJ 08002
(856) 321-2400
ehurwitz@stradley.com

*Counsel for Defendant, MarketPro South, Inc., d/b/a MarketPro Homebuyers*