# EXHIBIT A

# <u>EXPERT REPORT</u>

**Real Estate Expert Witnesses, LLC**
**Jeffrey S. Rothbart**

**Erin Wilcox and Connie Slingbaum**
**Plaintiffs**

**v.**

**MarketPro South, Inc. d/b/a MarketPro Homebuyers**
**Defendants**

**March 23, 2024**

**In the United States District Court**
**District of Maryland**

**Case 1:23-cv-02364**

**INTRODUCTION AND SCOPE OF WORK:**

1. Real Estate Expert Witnesses, LLC ("REEW"), by and through Jeffrey S. Rothbart its Managing Member, has been retained as an expert witness by Plaintiffs to opine on matters relating to real estate brokerage responsibilities as well as the business conducted by Defendant, MarketPro South, Inc.

2. All opinions contained herein are provided to a reasonable degree of professional certainty.

3. As discovery is ongoing, REEW reserves the right to supplement the opinions contained herein.

4. REEW is being paid $750 per hour as part of this engagement.

**REEW & JEFFREY ROTHBART:**

1. I have over 20 years of institutional, residential and commercial real estate experience including, but not limited to, valuation, acquisitions, development, general contracting, equity and debt financing, legal document review, asset/portfolio management, capital markets, leasing, dispositions, sustainability, HOA formation and administration and brokerage.

2. Highlights from my career include, but are not limited to, the following:
   a. Participated in over $3,000,000,000 of commercial real estate transactions across property type, risk profile and geography.
   b. Valued over $4,000,000,000 in commercial and residential real estate assets.
   c. Disposed of over $1,750,000,000 in commercial real estate assets.
   d. Formed over $200,000,000 in real estate joint ventures and other syndications.
   e. Managed over 11,000,000 SF of commercial real estate assets.
   f. Procured over $500,000,000 in equity and debt investments.
   g. Negotiated over 200 leases totaling more than 2,000,000 SF.
   h. Development of over $5 million in residential real estate.
   i. Own approximately 100 acres of raw land for development.

      j.   Own approximately 500 senior living beds.

3. I am a licensed Illinois attorney and a licensed Illinois Real Estate Broker. Over the majority of my career, I have served as de facto general counsel for the entities for which I have worked. My responsibilities as de facto counsel included overseeing all brokerage relationships. Further, I have served as the real estate agent for both buyers and sellers of residential real estate and therefore understand the scope of services to be provided by a real estate agent in a residential real estate purchase and sale.

4. Since 2007 I have been an Adjunct Professor of Law at Chicago Kent College of Law, where the course I teach (Real Estate Acquisition and Development) includes discussion of real estate brokers, as well as their roles and responsibilities in the transaction. In November of 2023, I was approved for an appointment as a member of the Adjunct Faculty at University of Illinois Chicago Law.

5. I have been qualified as a real estate expert witness on numerous occasions, and I have testified before the trier of fact in both State and Federal courts in over 25 matters. I have been retained/served as a real estate expert witness or litigation consultant in over 165 matters, several of which have dealt with real estate brokerage related issues. Previous clients include Fortune 100 companies, municipalities, public REITs, governmental agencies, universities, religious institutions, insurance companies, creditors to bankruptcy, equity investors, developers, general contractors, property owners, real estate brokers, tenants and individual homeowners.

6. I have published over 40 articles and research reports on the real estate markets, which were cited in over 100 different real estate publications. I have not published an article in the last 10 years.

7. I have a B.A. from Emory University, a J.D. from IIT-Chicago Kent College of Law, and an LL.M. in Taxation from Northwestern University.

8.  I also hold a Certificate in Hotel Real Estate and Asset Management from Cornell University as well as a Certificate in Real Estate Investment and Development from Rice University Jones Graduate School of Business.

9.  In approximately 2006, I became a 'market participant' for the PwC Korpacz Real Estate Investor Survey. I formerly held a LEED-AP for New Construction v2.2 as well as NASD/FINRA Series 22 and 63 licenses.  I am a Certified Mediator through-the National Association of Certified Mediators.

10. A complete CV is attached hereto as Exhibit A.

**<u>DOCUMENTS REVIEWED:</u>**

*Pleadings and Orders:*

1.  Class Action Complaint (the "Complaint");
2.  Responses and Objections of Defendant MarketPro South, Inc. d/b/a MarketPro Homebuyers to Plaintiffs' First Set of Requests for Admission (the "RFA"); and
3.  Responses and Objections of Defendant MarketPro South, Inc. d/b/a MarketPro Homebuyers to Plaintiffs' First Set of Interrogatories (the "ROGS Response").

*United States Code and other Regulations:*

1.  47 U.S.C. § 227(c)(5);
2.  47 C.F.R. §64.1200(c)(2);
3.  47 C.F.R. §64.1200(d)(4);

*Maryland Statutes:*

1.  Code of Maryland, Title 17 – Real Estate Brokers (the "Maryland Real Estate Broker Statute").

*Pennsylvania Statutes:*

1.  Pennsylvania Real Estate Licensing and Registration Act (the "Pennsylvania Real Estate Broker Statute).

*Other Documents:*

1. https://marketprodeals.com/ (the "MarketPro Sale Website")

2. https://www.marketprohomebuyers.com/ (the "MarketPro Website");

3. *MarketPro South, Inc. v. Old City Living Inc., et. al*, No. 22-cv-02415KSM, Second Amended Complaint ("Old City Living Exhibit A");

4. *MarketPro South, Inc. v. Old City Living Inc., et. al*, No. 22-cv-02415KSM, Memorandum of Law in Opposition to Defendants' Motion to Dismiss Second Amended Complaint ("Old City Living Exhibit B");

5. *McMorrow v. Core Properties, LLC*, No 4:23-cv-00126-JAR, Memorandum and Order (the "McMorrow Order");

6. Merriam Webster Online Dictionary (https://www.merriam-webster.com/);

7. State of Maryland Business Look Up[1];

8. State of Maryland Real Estate License Lookup Directory[2] (the "Maryland Directory");

9. State of Pennsylvania Real Estate License Lookup Directory [3] (the "Pennsylvania Directory"); and

10. The following Bates Numbered Documents:

| Starting Bates Range: | Ending Bates Range: | Defined Term: |
|---|---|---|
| MarketPro 0022 | MarketPro 0022 | The "Intake Form" |
| MarketPro 0023 | MarketPro 0024 | "Form Contract I" |
| MarketPro 0025 | MarketPro 0026 | "Form Contract II" |

## DEFINED TERMS

1. The "DNCR" shall be defined as the Do Not Call Registry;

2. The "Form Purchase Agreements" shall be defined as Form Contract I and Form Contract II;

3. "IRC" shall be defined as the Internal Revenue Code;

4. "MarketPro" shall be defined as Defendant, MarketPro South, Inc.;

5. "Slingbaum" shall be defined as Plaintiff, Ms. Slingbaum; and

6. "Wilcox" shall be defined as Plaintiff, Ms. Wilcox.

---

[1] https://egov.maryland.gov/BusinessExpress/EntitySearch
[2] https://www.dllr.state.md.us/cgi-bin/ElectronicLicensing/OP_search/OP_search.cgi?calling_app=RE::RE_qselect
[3] https://www.pals.pa.gov/#!/page/search

**EXPERT OPINIONS, BASIS THEREFORE AND FACTUAL INFORMATION:**

MarketPro is in the business "of acquiring real properties."[4] MarketPro solicited, via text message, Plaintiffs to inquire if they were interested in selling their homes.

Language contained in the solicitation text messages includes, but is not limited to, the following, "no fees", "can we discuss a quote", would you like to "discuss our proposal", "reasonable proposals" and "make fair contracts"[5] in the context of a real estate transaction.

Further the MarketPro Website states "if you want to pay ZERO commissions or fees, we have good news for you. No-commission sales are real! At MarketPro Homebuyers, we offer home sales with zero commission involved. When you work with us, we give you a cash offer for your home, as-is, and you get to skip all the typical costs of putting your home on the market."[6]

While the seller of a residential real estate property working with MarketPro may not pay brokerage commissions or other fees, MarketPro is taking upon itself services typically provided by real estate brokers. Specifically, this includes arranging for the services of third parties such as title agents as well as finding end purchasers for the property via the MarketPro Sale Website.

Further, MarketPro litters all over the MarketPro Website that they offer a no-commission sale.[7] While MarketPro is not charging a specific enumerated fee to the home seller for their services, nothing contained in the Documents Reviewed suggests that MarketPro is an IRC Section 501(c) entity with nonprofit status. MarketPro is not offering commission free purchases of real estate to be altruistic, they are doing it for profit. Based on the MarketPro Sale Website, MarketPro's strategy is to acquire houses quickly for all cash at below fair market value and then sell them at fair market value to third party purchasers.

To successfully execute this business strategy, MarketPro must engage in the following, without limitation: (i) a market evaluation for where the property is located; (ii) an evaluation of the

---

[4] Exhibit A, Paragraph 25
[5] Complaint, Paragraph 18
[6] https://www.marketprohomebuyers.com/sellers-guide-how-much-will-it-cost-to-sell-your-home/
[7] See e.g. https://www.marketprohomebuyers.com/3-alternatives-to-selling-your-home-through-a-realtor/

condition of the home; (iii) analysis of homes value based on the property and market conditions; and/or (iv) presentment of an offer to purchase real estate.

In furtherance of this strategy, MarketPro is consulting with the home sellers on the value of their residence. According to the MarketPro Website, "Our buying specialists will show line-by-line how we arrive at our offer, using current and accurate neighborhood comps, and why we may be the best fit…MarketPro has been a trusted and reliable homebuyer for over a decade in the Mid-Atlantic region. White-glove service from start to finish, integrity and client satisfaction is what sets our business apart. Our goal is to always OVER-deliver and for everything to be entirely hassle-free for our clients."[8]

According to the Merriam-Webster Online Dictionary, the word "consult" means to ask the advice or opinion of, or to deliberate together.[9]

The cumulative services offered by MarketPro are not all that different from a real estate broker. According to the National Association of Realtors, "A real estate agent is a licensed professional qualified to help clients buy and sell property. They use knowledge of the local market, property values, and negotiation skills to facilitate real estate transactions for buyers and sellers."[10]

**OPINION #1 – The Maryland Real Estate Broker Statute requires licensure for the activities conducted by Defendants.**

Support for this Opinion #1 includes, without limitation, the following:

- Pursuant to the Maryland Real Estate Broker Statute, one must be licensed in the State of Maryland to provide 'real estate brokerage services."[11]
- Specifically, Section 17-101(l) defines real estate brokerage services as to engage in any of the following activities:

  (1) for consideration, providing any of the following services for another person:

      (i) selling, buying, exchanging, or leasing any real estate; or

---

[8] https://www.marketprohomebuyers.com/frequently-asked-questions/
[9] https://www.merriam-webster.com/dictionary/consult?utm_campaign=sd&utm_medium=serp&utm_source=jsonld
[10] https://www.nar.realtor/about-nar/when-is-a-real-estate-agent-a-realtor
[11] Maryland Real Estate Broker Statute §17-101

   (ii) collecting rent for the use of any real estate;

  (2) for consideration, assisting another person to locate or obtain for purchase or lease any residential real estate;

  (3) engaging regularly in a business of dealing in real estate or leases or options on real estate;

  (4) engaging in a business the primary purpose of which is promoting the sale of real estate through a listing in a publication issued primarily for the promotion of real estate sales;

  (5) engaging in a business that subdivides land that is located in any state and sells the divided lots; or

  (6) for consideration, serving as a consultant regarding any activity set forth in items (1) through (5) of this subsection.

- The factual information stated above makes it clear that MarketPro engaged, for consideration, in provided selling services, engaged regularly in the business of dealing in real estate and/or acted as a consultant regarding other subsections.

**OPINION #2 – Similar to the Maryland Statute, the Pennsylvania Real Estate Broker Statute imposes similar restrictions as to how unlicensed personnel may conduct themselves in relation to real estate transactions.**

Support for this Opinion #2 includes, without limitation, the following:

- Pursuant to Chapter 2 of the Pennsylvania Real Estate Broker Statute, in order to conduct any of the following for another person for a fee, commission or other valuable consideration, any of the following:
  - Negotiates with or aids any person in locating for purchase, lease or an acquisition of interest in any real estate;
  - Negotiates the listing, sale, purchase, exchange, lease, time share and similarly designated interests financing or option of any real estate;
  - Manages any real estate;
  - Represents himself to be a real estate consultant, counsellor, agent or finder;
  - Undertakes to promote the sale, exchange, purchase or rental of real estate;
  - Undertakes to perform a comparative market analysis; or

- o   Attempts to perform any of these services.
- MarketPro certainly negotiated the sale of real estate (and/or represented themselves as a consultant in real estate), managed real estate, undertook to promote the sale of real estate and performed a comparative market analysis.

**OPINION #3 – Neither MarketPro nor any employees are licensed "brokers" in either the State of Maryland or Pennsylvania.**

Support for this Opinion #3 includes, without limitation, the following:

- To perform real estate related services in either Maryland or Pennsylvania, an individual must be licensed.
- Based on a search of the Maryland Directory, MarketPro is not a licensed entity to perform brokerage related services in the State of Maryland.[12] Further, none of the individuals listed in the ROGS Response[13] are actual real estate brokers, but rather possess salespersons licenses.
  - o   In Maryland, real estate salespersons are required to work under (and hang their licenses with) a real estate broker. In this case, both Robin Bogin and Sandy Liss hang their licenses[14] with Scheer Partners.[15] From the research I have been able to conduct, there is no relationship between MarketPro and Scheer Partners.[16] This means that Bogin and Liss are only able to engage in real estate related transactions on behalf of Scheer Partners, not MarketPro.
  - o   However, in opposition and contradiction to the ROGS Response, Greg Forsythe is not a licensed real estate salesman or broker according to the State of Maryland.[17]
- According to the ROGS Response,[18] no one at MarketPro is a licensed broker in the State of Pennsylvania. This is confirmed by the Pennsylvania Directory as neither of the two

---

[12] See Exhibit B; also see https://www.dllr.state.md.us/cgi-bin/ElectronicLicensing/OP_Search/OP_search.cgi?calling_app=RE::RE_business_name

[13] See Paragraph 16
[14] See Exhibit C
[15] https://scheerpartners.com/
[16] https://egov.maryland.gov/BusinessExpress/EntitySearch
[17] See Exhibit C
[18] The ROGS Response, Paragraph 17

MarketPro principals, Jeanette Winton nor Danny Bronstein[19] are licensed to perform real estate transactions in the State of Pennsylvania.[20]

**OPINION #4 – Residential real estate agents with listing agreements provide services to the seller of the home.**

Support for this Opinion #4 includes, without limitation, the following:

- Such services include, but are not limited to, finding interested buyers (and buyers' brokers), as well as arranging for third party service providers (e.g. title, survey, escrow, etc.).
- It is because these, and other, services are procured by the real estate broker, that such individuals are required to be licensed in both the State of Maryland and Pennsylvania.

**OPINION #5 – MarketPro, through its conduct, the Intake Form and Form Purchase Agreements, is conducting the services typically reserved for licensed real estate brokers.**

Support for this Opinion #5 includes, without limitation, the following:

- MarketPro requires the seller to sign off on the Intake Form. The Intake Form begins with the 'Estimated Realtor List Price.'
  - There is no other reasonable and/or reliable fashion to determine the 'Estimated Realtor List Price' without examining local sales comparables, as at least a starting point for the valuation.
  - Further, the Intake Form discusses 'Home Inspection Repair Costs' which can only be reasonably determined by conducting a home inspection.
  - Finally, as the seller is required to execute the Intake Form, the Intake Form should reasonably qualify as a report to the individual selling the home.
- While MarketPro contends that they do not conduct "inspection or appraisal services and/or reports to individuals interested in potentially selling real estate to MarketPro"[21], the Intake Form suggest the exact opposite. Moreover, these tasks, or the coordination thereof, is typically reserved for the real estate broker in the transaction.

---

[19] https://www.marketprohomebuyers.com/about/meet-the-team/
[20] https://www.pals.pa.gov/#!/page/search
[21] See the RFA, Paragraphs 14 – 17

- o MarketPro further contends that these services are only for their own, internal ability to determine a price,[22] however, given that they share said information with the prospective seller, the information, in my opinion, becomes a de facto appraisal and/or home inspection report.

- Similarly, Form Contract I makes specific references to obligations typically reserved for real estate brokers including, but not limited to:
  - o Section 3[23] – The settlement fees provided cover obligations typically reserved for real estate brokers such as arrangement of title, survey and escrow fees. While MarketPro contends that it makes such arrangements for its own benefit,[24] there are ancillary benefits provided to the buyer from the procurement of the same, primarily cost savings as well as review of legal documents to ensure marketability of title.

**OPINION #6 – Pursuant to the applicable State Statutes, a 'commission' is not required to receive compensation for brokerage related services.**

Support for this Opinion #6 includes, without limitation, the following:

- As stated above, neither the State of Maryland nor the State of Pennsylvania require a commission to be paid in order to receive real estate brokerage related services.

- The cumulative result of the aforementioned statutes is that fee, commission or other valuable consideration may result from the performance of real estate brokerage related services.

- In fact, MarketPro is earning valuable consideration from its business practices of providing real estate brokerage related services. MarketPro earns this fee by purchasing the subject property for a below-market valuation and then selling (or assigning the contract to) that same subject property for fair market value. MarketPro has admitted the same.[25]

- There is no functional difference between this financial relationship and the payment of a fee or commission. This is consistent with findings enumerated in the McMorrow Order.

---

[22] See the RFA, Paragraphs 14 – 17
[23] MarketPro 0024, See also Section 11 to Form Contract II at MarketPro 0026
[24] The ROGS Response, Paragraphs 12 and 13
[25] The RFA, Paragraphs 21 and 22, See also the ROGS Response Paragraphs 12 and 15

**OPINION #7 – Section 9 to Form Contract I tries to disclaim MarketPro's conduct, however, MarketPro is engaged in the exact behavior it seeks to disclaim.**

Support for this Opinion #7 includes, without limitation, the following:

- The last two sentences to Section 9 of Form Contract I state "Seller fully understands that the buyer and/or its representatives are not collecting any fee or commissions from the seller. Seller should not expect any representation from buyer or its representatives, and all legal or financial questions should be answered by seller's legal advisor."

- In relation to the first quoted sentence above, the buyer (i.e. MarketPro) is certainly collecting a fee or other consideration in exchange for their services. As stated above, there is no evidence in the Documents Reviewed to suggest that MarketPro is a non-profit organization.

  - Rather, MarketPro is a for profit enterprise which earns revenue by purchasing homes at below fair market value and then either selling the home or assigning the contract to acquire the home for fair market value.

  - It is my opinion that MarketPro segments the real estate transaction to further their financial interests (and to the detriment of the homeowner/seller) due to their assignment policies[26] and circumventing the traditional market approach.

- For example, in the *Old City Living* matter, MarketPro executed a contract to purchase a property from a homeowner for $20,000 on April 13, 2022. Two weeks later, on April 27, 2022, MarketPro entered into an assignment contract with a third-party buyer for $110,000 to acquire the same property. It is my opinion that the $90,000 assignment fee represents an arbitrage of the property for consideration by MarketPro.[27] MarketPro, based on the facts in the pleadings, never took possession of the property and therefore could not have improved the same, nor would a reasonable change in market conditions cause the property value to increase by $90,000 in a mere two weeks.

  - Further, the $90,000 assignment fee earned by MarketPro in this instance was far in excess of the traditional cost of sale for the same property by the original homeowner/seller. The homeowner, rather than MarketPro, would have received

---

[26] See Old City Living Exhibit A and Old City Living Exhibit B (e.g. charging $90,000 in assignment fees for a similar transaction)

[27] MarketPro admits such arbitrage business strategy in Old City Living Exhibit A, Paragraph 25

the majority of these funds had the property been sold through typical market channels and with the use of a licensed real estate broker.

- In relation to the second quoted sentence above, the buyer is certainly providing representations regarding legal and financial information to the seller. The terms of the Form Purchase Agreements dictate the same.

- MarketPro is an unlicensed middleman for each of these assignment transactions.

_____

By:  Jeffrey S. Rothbart
Date: March 23, 2024

# EXHIBIT A

# Jeffrey S. Rothbart, Esq., LL.M.



Mobile - (312) 307-1429
jr@realestateexpertwitnesses.com
www.realestateexpertwitnesses.com

Mr. Rothbart has been an expert witness since 2006, has been qualified in over 25 Stated and Federal courts, and has retained on over 150 matters. Previous clients include, but are not limited to, municipalities, public REITs, Fortune 100 Companies, governmental agencies, universities, insurance companies, creditors to bankruptcy, equity investors, developers, general contractors, property owners, tenants and individual homeowners.

Mr. Rothbart's qualifications include, without limitation:

- Over 20 years of direct commercial and residential real estate experience.
- Licensed Illinois attorney with focus on real estate, tax, bankruptcy and securities law.
- Licensed Illinois real estate broker.
- Adjunct Professor of Law since 2007.
- Participated in over $3,000,000,000 of commercial real estate transactions.
- Valued over $4,000,000,000 in commerical and residential real estate assets.
- Direct experience working for publicly traded REIT's, private equity, developers and general contracting.
- Experienced across property type, geography and risk profile.
- Formed over $200,000,000 in real estate joint ventures.
- Managed over 11,000,000 SF of commercial real estate assets.
- Procured over $500,000,000 in equity and debt investments.
- Approved over 200 leases totaling more than 2,000,000 SF.
- Published over 40 articles on commercial real estate investments and markets; cited in over 100 articles.
- Reviewed, commented and critiqued on over 100 MAI Appraisals.

Prior expert experience includes, without limitation, real estate valuation, LLC Operating Agreements, breach of fiduciary duties, breach of representations and warranties, land use, partnership disputes, zoning and entitlment, survey and title issues, construction damages, standard of care issues, homeowners associations, divorce related issues, brokerage relationships, property tax appeals, eminent domain, landlord/tenant disputes and deceptive leasing practices. Please also see https://www.realestateexpertwitnesses.com/areas-of-expertise/

### *PROFESSIONAL EXPERIENCE*

### STACK REAL ESTATE, LLC                                         2013 to Present
**Managing Member**
*A full service real estate firm focused on acquisitions, development, capital markets procurement and consulting.*

- Actively seeking acquisition and development oppprtinities on a nationwide,  opportunistic basis.
- Procured equity and debt capital for institutional acquisition and development projects nationwide.
- Served as an independent manager of real estate related limited liability companies.
- Affiliated entities include, but are not limited to, Real Estate Expert Witnesses, LLC, Real Estate Dispute Mediation, LLC, Real Estate Independent Manager, LLC, Berkshire Hathaway Home Services Chicago, Golden Years Advisors, LLC, Birchwood Health Care Partners, LLC, Insignia Homes, LLC, Peer Realty, LLC and Ernst & Young.

## EPN INVESTMENT MANAGEMENT, LLC | EDT RETAIL TRUST, Skokie, IL          2011 to 2013
*A private investment group focused on retail real estate investments throughout the United States, Europe and Latin America.*

### Vice President, Capital Markets (8/2011 – 8/2013) | EPN INVESTMENT MANAGEMENT, LLC
Recruited by EPN after its privatization of EDT Retail Trust (see below) to lead the capital markets department which was responsible for equity and debt capital procurement throughout the global platform.
- Spearheaded business development efforts to develop new and existing equity capital relationships.
- Originated complex capital markets products such as subordinated and mezzanine debt, preferred equity or similar.
- Maintained all of the firm's global relationships with lending institutions (insurance companies, commercial banks and CMBS conduits) and equity investors (pensions, endowments, foundations, sovereign wealth funds, hedge funds and family offices).
- Sourced, negotiated or closed over $500M in crossed collateralized financing for both fixed and floating rate debt.
- Launched EPN's Latin American development and acquisitions platform and evaluated M&A opportunities.
- Advised acquisition team on forecasting and budgeting for prospective investments.
- Served as de-facto general counsel by drafting or negotiating substantially all legal agreements and managing all litigation.

### Vice President, Finance and Asset Management (1/2011 – 8/2011) | EDT RETAIL TRUST
Oversaw operations of a publicly traded REIT (ASX: EDT) working directly under the CEO. EDT owned 12M square feet of institutional grade real estate located across 20 states with an approximate valuation of $1.43B.
- Spearheaded portfolio and financial management including financial forecasting and budgeting, strategic repositioning, redevelopment, leasing, debt financing and asset-level marketing.
- Managed condemnation process due to road expansion where potential damages exceeded $40 million.
- Prepared financial and investor reporting, including annual reports, quarterly supplemental and Board of Director materials.
- Served as a liaison between the Board Finance, Audit and Investment Committees and third-parties.
- Forecasted REIT and asset level net operating income, expenses and cash flow.
- Worked with DDR Corp. (NYSE: DDR) to streamline reporting to ensure accuracy of property level forecasting and budgeting.
- Reviewed and approved operating and capital expenditure budgets and corporate income statements and balance sheets.
- Performed quarterly, asset valuations across the entire portfolio on an individual asset basis.
- Generated 6.0% annual revenue growth from owned real estate by approving 200 new and renewal retail leases totaling 2M SF with a cumulative first year NOI in excess of $25M.
- Assisted investment banks and advisory consultants in relation to EPN's tender offer and the ultimate disposition of EDT.

## SUPERIOR STREET CAPITAL LLC, Chicago, IL          2009 to 2011
*A privately-held real estate firm focused on recapitalization and monetization of distressed situations.*

### Managing Director
Founded a real estate investment firm focused on the acquisition of U.S. commercial real estate through the recapitalization of distressed assets and the monetization of real estate related derivative instruments.
- Implemented tax structuring to mitigate tax consequences to owners of distressed Tenant-in Common syndications through debt restructuring of debt, subordinating investor interest and consolidating management operations.

**BOULDER NET LEASE FUNDS, LLC | THE BOULDER GROUP, Northbrook, IL**     2003 to 2009
*A private commercial real estate group focused on office and industrial investments throughout the United States.*

**Principal** (2004 - 2009) | BOULDER NET LEASE FUNDS, LLC
Co-founded a real estate private equity company specializing in the acquisition of net leased properties.
- Originated $175 million for two real estate private equity vehicles through discretionary and joint-venture investors.
- Managed all aspects of operations including acquisitions, capital markets, finance, asset management and dispositions.
- Acquired and managed over 1.7M SF of net leased properties nationwide.
- Realized a leveraged, net IRR of 25.5% with an equity multiple of 1.8x.
- Sourced on-balance sheet LIBOR based line of credit with Merrill Lynch Capital.
- Structured sale-leaseback transactions in conformance with FASB and GAAP.
- Served as the primary liaison to legal, accounting, securities, insurance and financial advisors.
- Conducted all due diligence review of property, financial, legal, debt, market and tenant related documentation.
- Underwrote transactions and evaluated IRR, equity multiple and cash-on-cash returns using ARGUS and Excel.
- Managed condemnation process re expansion of a state highway with potential damages exceeding $15M.
- Drafted all investment committee memoranda and implemented all post-Closing, asset business plans.
- Managed all investor relations related functions including investor presentations, financial reporting and cash flow forecasting.
- Negotiated all Private Placement Memorandums and Joint Venture Agreements, Letters of Intent, Purchase and Sale Agreements and Loan Documentation.

**Research Director** (2003 - 2009) | THE BOULDER GROUP
Served as the Research Director for a commercial real estate brokerage firm focused on the net lease sector. All published research was used to generate and affirm the investment strategies implemented by Boulder Net Lease Funds.
- Published over 40 articles on the net lease real estate market which have been cited in over 95 real estate publications including Forbes Magazine, The Korpacz Real Estate Investor Survey published by PriceWaterhouseCoopers, Retail Traffic, Net Lease Forum, Globe Street, Commercial Property News, as well as other national and local real estate publications.
- Prepared and reviewed legal documents including, such as limited liability company operating agreements, assignment agreements, triple net leases, real estate purchase contracts and securitized loan documents.
- Consulted, either as an expert witness or on a third-party basis, for institutional investors, municipalities, corporation and secured and unsecured creditors to a bankruptcy as to the valuation of net leased assets on a nationwide basis.

**Associate Real Estate and Tax Attorney,** Field and Goldberg, LLC, Chicago, IL     2003

**Legal Department Associate**, Related Midwest (f/k/a LR Development Company, LLC), Chicago, IL     2000 to 2002

*INDUSTRY LEADERSHIP*
**Adjunct Professor of Law,** UNIVERSITY OF ILLINOIS CHICAGO, Chicago, IL     2023 to Present
**Adjunct Professor of Law,** IIT- CHICAGO-KENT COLLEGE OF LAW, Chicago, IL     2007 to Present
**Survey Participant, PWC Korpecz Real Estate Survey**     2006 to Present

## *EDUCATION*

| | |
|---|---|
| **Real Estate Investment and Development Certificate,** RICE BUSINESS, Houston, TX | 2021 |
| **Hotel Real Estate Investments and Asset Management Certificate,** CORNELL UNIVERSITY, Ithaca, NY | 2020 |
| **Masters of Law in Taxation,** NORTHWESTERN UNIVERSITY, Chicago, IL | 2003 |
| **Juris Doctor**, CHICAGO-KENT COLLEGE OF LAW – ILLINOIS INSTITUTE OF TECHNOLOGY, Chicago, IL | 2002 |
| **Bachelor of Arts in Political Science**, EMORY UNIVERSITY, Atlanta, GA | 1999 |

## *LICENSES & CERTIFICATIONS*

| | |
|---|---|
| **Certified Mediator,** NATIONAL ASSOCIATION OF CERTIFIED MEDIATORS | 2021 |
| Illinois Real Estate Broker | 2015 |
| LEED-AP for New Construction v2.2 | 2009 |
| NASD Series 22 and 63 License | 2004 |
| American Bar Association (State of IL Attorney Registration & Disciplinary Commission) | 2002 to Present |

## *COMPUTER LITERACY*

Highly proficient in Microsoft Office, ARGUS and YARDI

# JEFFREY S. ROTHBART

---

**EXPERT TESTIMONY**

**Hibbett Sporting Goods, Inc. v. ML Georgetown Paris, LLC**                    Georgetown, KY
- Served as an expert witness relating to a landlord tenant dispute

**Robert Jones v. Triple Springs, Inv.**                    Jefferson County, KY
- Served as an expert witness relating to fiduciary duties

**Springer v. Seven Custom Homes**                    Austin, TX
- Served as an expert witness relating to brokerage standards of care

**Multifamily Acquisition Advisors LLC v. Chicago Title Oklahoma, et. al**                    Oklahoma City, OK
- Served as an expert witness relating to standards of care for escrow agents

**Edison Print Solutions, LLC v. Forest Envelope Company, et. al.**                    Will County, IL
- Served as an expert witness relating to a landlord tenant dispute

**Edison Print Solutions, LLC v. Forest Envelope Company, et. al.**                    Will County, IL
- Served as an expert witness relating to a landlord tenant dispute

**Klimp v. SVRE Real Estate**                    Las Vegas, NV
- Served as an expert witness relating to brokerage standards of care

**Sitzer v. National Association of Realtors**                    Kansas City, MO
- Served as an expert witness relating rules and regulations stipulated by NAR

**Haber v. Haber \***                    Irvine, CA
- Served as an expert witness relating to valuation of a residence in a divorce proceeding.

**George Street v. Parikh Family Company \***                    Lake County, IL
- Served as an expert witness relating to purchase and sale agreements

**Morabito v. Jennings and Hall**                    Orange County, CA
- Served as an expert witness relating liability of a general partner.

**Kirklnad v. Feddersen**                    US Virgin Islands
- Served as an expert witness relating to brokerage standards of care

**Bistum Eichstatt K.D.O.R. Finanzkammer et al v Silverman et al**                    Dallas, TX
- Served as an expert witness relating to financing documentation

**Arlington Heights Medical Center, LLC v. Arlington Dermatology, S.C.**                    Arlington Heights, IL
- Served as an expert witness relating to landlord tenant, leasing dispute

**Hoodbhoy v. The City View Condominium, et al.**                    Washington, DC
- Served as an expert witness relating to HOA standards of care

**Michael Greenberg et. al. v. Jim Angelopoulos et. al**                    Chicago, IL
- Served as an expert witness on industry standards for the purchase and sale of real estate.

**Target 5, LLLP v Chicago Real Estate Resources, Inc.\***                    Chicago, IL
- Served as an expert witness relating to brokerage standard of care issues.

**Richard Rudlaff & Pure Michigan, LLC v. Traverse Bay RV Park Condominium Association**                    Acme, MI
- Served as an expert witness relating to damages corresponding to COA restrictive covenants.

**Spector v. Hammer**                    Deerfield, IL
- Served as an expert witness on breach of representation and warranty in a Purchase Agreement

# JEFFREY S. ROTHBART

as well as title and survey matters.

**White House Ventures, LLC v. Alice Phelan Sullivan Corp.**                              San Francisco, CA
- Served as an expert witness on valuation due to an incomplete 1031 exchange.

**J.G. Wahlert v. Kovitz Shifrin Nesbit, a Professional Corporation, et. al.**            Mundelein, IL
- Served as an expert witness relating to title and survey and rights of a Property Owners Association

**Centerpointe TIC et. Al v, VEREIT, Inc., EFA Asset Management, LLC, et. al. ***        Los Angeles, CA
- Served as an expert witness relating to standard of care for a retail asset manager in a Tenant In Common program.

**Hunter's Ridge Loan Group, LLC v. US Capital Alliance, LLC, Allan Feker, et. Al.**     Volusia County, FL
- Served as an expert witness relating to foreclosure of land by private lender.

**Munster Steel Co., Inc., v. CPV Partners and Centennial Village, LLC**                 Munster, IN
- Served as a litigation consultant relating to breach of contract for a purchase and sale agreement.

**In re Morrow Park***                                                                    Dover, DE
- Served as an expert witness relating to market standards for the three-appraiser rule and corresponding business interference from failure to refinance.

**NNN 400 v. Wells Fargo**                                                                Little Rock, AR
- Served as an expert witness relating to confidentiality and disclosure of information.

**Meribeth Nelson v. City of Kankakee**                                                   Kankakee, IL
- Served as an expert witness on the diminution in value due to premature demolition.

**Meltzer et al v. Rixey, LLC and Hillhouse Group, LLC**                                  Baltimore, MD
- Served as an expert witness on partnership dispute and market standards for exempt private LLC offerings

\* Denotes testimony at trial, mediation or arbitration

# JEFFREY S. ROTHBART

**PUBLISHED AND CITED ARTICLES**
- Net Lease Transaction Volume down 63% in Q4, Globest.com, January 22, 2009
- Net Lease Market Report Q4 2008, Boulder Net Lease Funds, December 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2008
- Net Lease Market Report Q3 2008, Boulder Net Lease Funds, October 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2008
- National Real Estate Investor, Sale Saleback Quandary, September 1, 2008
- Net Lease Market Report Q2 2008, Boulder Net Lease Funds, June 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Second Quarter 2008
- Forbes Magazine, Building Boom, Matthew Swibel, June 2, 2008
- Net Lease Insiders: Take What the Market Gives, Globest.com, April 28, 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, First Quarter 2008
- Net Lease Market Report Q1 2008, Boulder Net Lease Funds, March 2008
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2007
- Net Lease Market Report Q4 2007, Boulder Net Lease Funds, December 2007
- Real Estate Forum, Tomorrows Newsmakers, Top 250 Real Estate Executives under 35, August 2007
- Real Estate Forum, New Tools of the Trade, July 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2007
- Net Lease Market Report Q3 2007, Boulder Net Lease Funds, September 2007
- Commercial Property News Website, Net Lease Market Growth Slows, July 10 2007
- Retail Traffic, Traffic Patters May 2007
- Real Estate Forum, Today's Sale Leaseback Transactions Give Sellers More Than Just Cash Back, April 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Second Quarter 2007
- Net Lease Market Report Q2 2007, Boulder Net Lease Funds, June 2007
- Real Estate Forum, Net Lease Review: Retail Still Riding High, April 2007
- Commercial Property News , Online Edition, March 3, 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, First Quarter 2007
- Net Lease Market Report Q1 2007, Boulder Net Lease Funds, March 2007
- Commercial Property News, February 1, 2007
- Real Estate Forum, Another Wild Ride? January 2007
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2006
- Net Lease Market Report Q4 2006, Boulder Net Lease Funds, December 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2006
- Net Lease Market Report Q3 2006, Boulder Net Lease Funds, September 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Second Quarter 2006
- The Net Lease Restaurant Report, Boulder Net Lease Funds, June 2006
- Net Lease Market Report Q2 2006, Boulder Net Lease Funds, June 2006
- The Net Lease Bank Branch Report, Boulder Net Lease Funds, July 2006
- The Net Lease Drug Store Report, Boulder Net Lease Funds, July 2006
- Retail Traffic, April 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, First Quarter 2006
- Net Lease Market Report Q1 2006, Boulder Net Lease Funds, March 2006
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Fourth Quarter 2005
- Net Lease Market Report Q4 2005, Boulder Net Lease Funds, December 2005
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2005
- Net Lease Market Report Q3 2005, The Boulder Group, September 2005
- The Sale Leaseback Report, The Boulder Group, August 2005
- Net Lease Forum, July 19, 2005, Vol. 03 No. 10
- The Credit Ratings Report, The Boulder Group, July 2005
- Net Lease Market Report Q2 2005, The Boulder Group, June 2005
- Mortgage and Real Estate Executives Report, May 15, 2005, Volume 38 Number 6
- The Net Lease Restaurant Market Report, The Boulder Group, May 2005
- Drugstores Command Higher Prices, Globest.com, April 20, 2005
- Mortgage and Real Estate Executives Report, April 1, 2005, Volume 38 Number 3
- The Net Lease Drug Store Report, The Boulder Group, April 2005
- Net Lease Market Report Q1 2005, The Boulder Group, March 2005
- The Big Box Net Lease Market Report, The Boulder Group, February 2005
- High Cap Rate Properties Report, The Boulder Group, January 2005

# JEFFREY S. ROTHBART

- Net Lease Market Report Q4 2004, The Boulder Group, December 2004
- The Chicago Net Lease Market Report, The Boulder Group, November 2004
- Net Lease Forum, October 19, 2004, Vol. 2 No. 16
- Net Lease Fund Returns Outperform Competitors, The Boulder Group, October 2004.
- Mortgage and Real Estate Executives Report, September 15, 2004, Volume 37 Number 14
- Mortgage and Real Estate Executives Report, September 1, 2004, Volume 37 Number 13
- Korpacz Real Estate Investor Survey, PriceWaterhouseCoopers, Third Quarter 2004
- Shopping Center Business, September 2004
- Mortgage and Real Estate Executives Report, September 15, 2004, Volume 38 Number 14
- Net Lease Forum, September 7, 2004, Vol. 2 No. 13
- Net Lease Market Report Q3 2004, The Boulder Group, September 2004
- Net Lease Forum, August 3, 2004, Vol. 2; Quarter Sees Jump in Net Lease Asset Market, Globest.com, August 25, 2004
- Mortgage and Real Estate Executives Report, August 1, 2004, Volume 37 Number 11
- The Estate Planning Net Lease Report, The Boulder Group, August 2004
- Mortgage and Real Estate Executives Report, July 15, 2004, Volume 37 Number 10
- Institutional Real Estate Investor, July 2004
- The Big Box Net Lease Market Report, The Boulder Group, July 2004
- Big-Box Net-Lease Properties Harder to Find, Globest.com, June 29, 2004
- More Retail Users Buying Big Boxes, Commercial Property News Website, June 29, 2004
- Net Lease Forum, June 15, 2004
- Net Lease Market Report Q2 2004, The Boulder Group, June 2004
- Mortgage and Real Estate Executives Report, June 1, 2004, Volume 37 Number 7
- Mortgage and Real Estate Executives Report, May 1, 2004, Volume 37 Number 5
- The Net Lease Drug Store Report, The Boulder Group, May 2004
- Mortgage and Real Estate Executives Report, April 1, 2004, Volume 37 Number 3
- The Net Lease Restaurant Report, The Boulder Group, April 2004
- The Chicago Net Lease Market Report, The Boulder Group, March 2004
- Net Lease Market Report Q1 2004, The Boulder Group, March 2004
- Chicago Area Real Estate Investors Association – Gave Presentation on I.R.C. §1031 exchanges, January 2004. I.R.C. §1033 Exchanges, The Boulder Group, February 2004
- Commercial Property News, January 1, 2004
- Retail Traffic, January 2004
- Ground Leases, The Boulder Group, January 2004
- Net Lease Forum, December 18, 2003, Vol. 1 No. 18
- Mortgage and Real Estate Executives Report, December 15, 2003, Volume 36 Number 20
- Net Lease Market Report Q4 2003, The Boulder Group, December 2003
- Retail Traffic, December 2003
- Mortgage and Real Estate Executives Report, December 15, 2003, Volume 36 Number 20
- Triple Net v. Tax?, The Boulder Group, November 2003